## 8808

### ELEAZER *ET AL.* v. SHEALY, CLERK OF COURT.

#### (81 S. E. 648.)

JUDICIAL SALES. CHECK AS PAYMENT. NEGLIGENCE IN COLLECTING CHECK. SUFFICIENCY OF EVIDENCE. HARMLESS. ERROR.

1. In an action by the purchaser of land at a judicial sale, claimed to have been paid for by giving a check to defendant clerk of Court, which he failed to diligently present for payment before the bank had become insolvent, to compel defendant to make title to the land to plaintiff, evidence *held* to sustain a finding that the clerk received the check to collect it for plaintiff, and not as payment, and that he made reasonable efforts to collect the check.

2. The judgment will not be reversed because of any errors which are not shown to have been prejudicial to appellant's rights.

Before SHIPP, J., Lexington, June, 1913.    Affirmed.

Action by Sarah C. Eleazer and husband against Frank W. Shealy, clerk of Court of Common Pleas and General Sessions for Lexington county and special referee. From a judgment for defendant, plaintiffs appeal. Affirmed.

The Circuit decree, appealed from, was as follows:

Sarah Eleazer and her husband, H. H. Eleazer, complaining of F. W. Shealy, clerk of Court of Lexington county, allege that certain lands belonging to J. T. Bouknight, deceased, were sold by said clerk of the Court under an order of Court, signed by Hon. J. W. DeVore, Circuit Judge, and that said sale took place on sales day in February, 1912, said lands being described in the petition; that said lands were bid off by Walter Looney, for the price of four hundred and forty dollars and thereafter said Looney for value, to wit, in consideration of an agreement to pay him the sum of five hundred dollars, duly assigned said bid to petitioner, Sarah C. Eleazer, and authorized the clerk of the Court to make title therefor to said petitioner; that on the 22d of February, H. H. Eleazer, the husband of Sarah

C. Eleazer, acting for her, paid to the clerk and special referee the sum of five hundred dollars in accordance with the agreement with Looney and in full payment of the purchase price of the tract of land; that payment was made to the clerk by giving him a cashier's check on the Lexington Savings Bank, which it is alleged the clerk received and accepted as payment, and for which the clerk executed a receipt as follows: "Lexington, S. C., 2-21-1912. Received from H. H. Eleazer five hundred and no-100 dollars, payment on tract No. 4 in Bouknight estate, deed to be executed to S. C. Eleazer. $500.00. (Sd.) Frank W. Shealy, C. C. C. P. & G. S."

That the petitioner heard no more from the clerk until about the 27th day of March, 1912, when he received notice from the clerk that he was unable to collect check; that in the meantime, to wit, on the 23d of March, Lexington Savings Bank, which is situated at Lexington Courthouse, failed in business and a receiver was appointed, the bank having been declared insolvent, and that this happened after the clerk had a reasonable time in which to have collected the check; it further alleges that failure of the clerk to collect the check was due to his negligence, and petitioners pray that the Court require the clerk to execute to Sarah C. Eleazer title to said tract of land.

The answer of the defendant, Shealy, clerk, admits that the land was sold under order of Court on sales day in February, 1912, and that the same was bid by Walter Looney and his bid transferred to Sarah C. Eleazer, and that the clerk was authorized to make title therefor to Sarah C. Eleazer. The answer sets up by way of defense that soon after the sale and assignment of the bid, H. H. Eleazer offered him a check drawn by one Riddle, in favor of either H. H. Eleazer or Sarah C. Eleazer, for the sum of five hundred dollars in payment of the assigned bid, but that he refused to receive it for the reason that he had been having trouble with checks from said bank and he would not take

said check; that later on in the same day H. H. Eleazer returned with a cashier's check on the Lexington Bank, and offered it to the defendant in payment of said bid, but defendant refused to accept is as such payment, but agreed to take it and try to collect it, and if he could do so, he would credit the amount on the bid. That defendant presented the check or draft to the bank for payment on the same day it was received and on the subsequent day, and made several other attempts to collect it and failed to collect it; that at no time after he received the check for collection was the bank in a condition to pay it. That the defendant gave Eleazer a receipt for the check in order that the said Eleazer have something to show for the check to the defendant; that as soon as defendant found that he could not collect the check he wrote several letters to Eleazer, informing him of his inability to collect the same. Defendant admits that he has refused to make title under the circumstances.

The testimony in this case is very conflicting. If the clerk was negligent in his dealing with the check, and if he failed to collect it on account of his want of diligence in presenting the check for payment, or if in the first instance he received the check in payment, then the loss would fall on the clerk. If, however, the clerk received the check not in payment, or if he used due diligence in collecting the check, or in presenting the check, then the loss must fall on the Eleazers. The testimony is very conflicting. I know personally most of the witnesses on behalf of the defendant, while I am unacquainted with most of the witnesses for the petitioner. After considering all of the testimony, I am satisfied that Mr. Shealy received the check not in payment of the money, but received it for the purpose of collecting the check for the petitioners, and, if collected, to apply it to the purchase price of the land. I am, therefore, satisfied from the testimony, that the bank was in bad condition at the time and that Mr. Shealy made reasonable efforts to collect the check and failed. He wrote several

letters to petitioner, H. H. Eleazer, informing him of his inability to collect the check, notifying him of his effort to collect the same. It is true that the letters were not sent to the correct postoffice address of Mr. Eleazer, and it may be on that account that Mr. Eleazer had no notice, still, Mr. Shealy acted in good faith and the fact that he wrote the letters and endeavored to notify Mr. Eleazer, bear forcefully upon the question of his diligence in reference to the check. If the check was refused payment by the bank, in the hands of Mr. Shealy on account of its embarrassed condition, I can not see that Mr. Eleazer would have met with greater success, had he himself known of the situation and had attempted to collect the check himself. I think that the check was not paid because of the condition of the bank and that the loss should not fall upon the clerk of the Court. It is, therefore, ordered that the petition be, and the same is hereby, dismissed.

*Mr. D. W. Robinson,* for the appellant, cites: *Conditional receipt of check:* 83 S. C. 205-7; 90 S. C. 543. *Diligence in presenting check:* 22 L. R. A. 788, 789; 2 Morse Banking (4th ed.), sec. 421 (c); 69 S. E. 1014-15; 32 L. R. A. (N. S.) 991; 4 Am. St. Rep. 844; 62 Mich. 199; 47 Am. St. Rep. 406, 413; 79 Md. 312; 32 Am. Dec. 527; 20 Wend. 192; 49 Am. St. Rep. 47, 53; 103 Ala. 45-8; 52 S. E. 1017; 4 L. R. A. (N. S.) 135; 5 Am. & Eng. Enc. of L. 1040-1042; 2 Daniel Neg. Instruments, secs. 1590-1; 2 Morse Banking (4th ed.), sec. 423. *Diligence in giving notice of nonpayment:* 2 Morse on Bank and Banking, sec. 421 (b), (c), 422; 77 Am. St. Rep. 620-622; 52 S. E. 1017; 4 L. R. A. (N. S.) 135. *Question of diligence, one of law:* 47 Am. St. Rep. 408; 79 Md. 312; 51 Am. St. Rep. 92, 93; 95 Ga. 376. *Duty where unsafe condition of bank is known to holder of check:* 69 S. E. 1016; 32 L. R. A. (N. S.) 993; 79 N. W. 859; 80 N. C. 31; 2 Morse Banks and Banking, sec. 421 (i). *Place to give notice:* 2 *Ib.,* sec. 428. *Discharge of drawer*

*and indorser:* 2 *Ib.,* sec. 421 (a), (b), (d), (i), 422, 423; 5 Am. & Eng. Enc. of L. 1031, 1045; 2 Daniel on Neg. Insts. (5th ed.), secs. 1496, 1587; 6 Wend. 445; 15 L. R. A. (N. S.) 213, note. *Holder failing to notify drawer must shoulder the loss:* 2 Morse Banks and Banking, sec. 421 (i), (d); 41 Am. St. Rep. 92, 93; 49 Am. St. Rep. 45; 5 Am. & Eng. Enc. of L. (2d ed.) 1013, 1044. *Burden of proof:* 22 L. R. A. (N. S.) 788, 789; 2 Morse Banks and Banking 421 (b), (c) and (f).

*Mr. C. M. Efird,* for the respondent, cites: *Due diligence a question of fact:* 13 S. C. 343; 11 S. C. 454; 3 Hill L. 77.

April 21, 1914.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The facts herein are stated in the decree of his Honor, the Circuit Judge.

In his findings of fact, he says: "After considering all the testimony, I am satisfied that Mr. Shealy received the check, not in payment of the money, but received it for the purpose of collecting the check for the petitioners, and, if collected, to apply it to the purchase price of the land. I am therefore satisfied from the testimony that the bank was in bad condition at the time, and that Mr. Shealy made reasonable efforts to collect the check and failed." The appellants have failed to satisfy this Court, by the preponderance of evidence, that these findings were erroneous.

Having reached this conclusion, the petition should be dismissed, for the reason that, even if the decree was erroneous in any other respect, it has not been made to appear that the error was prejudicial to the rights of the appellants.

Judgment affirmed.

WATTS, J., concurs in the opinion of the Chief Justice.

MR. JUSTICE FRASER, *dissenting.* Stripped of useless complications, the case is as follows: Mr. Shealy, as clerk of the Court of Lexington county, sold a tract of land and was requested to make title to Mrs. Eleazer. Mr. Eleazer offered in payment a check by one Riddle, drawn on Lexington Savings Bank, for $600. Mrs. Eleazer was to pay $500 for the land. Mr. Shealy was asked to take the check as cash and give his own check for the difference. This Mr. Shealy refused to do. Mr. Eleazer went off and returned with a cashier's check of the Lexington Savings Bank for the $500, as follows: "No. 1034. Lexington, S. C., February 21, 1912. Pay to the order of H. H. Eleazer $500.00 (five hundred and 00-100 dollars). Not over five hundred ($500.00). (Signed) W. P. Roof, Jr., Asst. Cashier. Cashier's Check." This Mr. Shealy took and gave a receipt that read as follows: "Lexington, S. C., 2-21-1912. Received from H. H. Eleazer five hundred and no-100 dollars. Payment on tract No. 4 Bouknight estate, deed to be executed to S. C. Eleazer. (Signed) Frank W. Shealy, C. C. C. P. & G. S. $500.00."

Mr. Shealy's own statement on the direct examination is as follows:

"Q. Mr. Shealy, what position do you hold—what office? A. Clerk of Court. Q. What office did you hold in February, 1912? A. Same. Q. You know Mr. H. H. Eleazer? A. Yes, sir. Q. Did he have any transactions with you as clerk of Court about the latter part of February? A. Yes, sir. Q. Now, can you fix the date about? A. Yes, sir. Q. What date? A. 21st February. Q. What transactions, what business? A. Mr. Looney had bought a piece of land at Bouknight estate sale, which piece of land was supposed to have been transferred to Mr. Eleazer; the transfer was inaccurate and had just been returned by me, and on the 21st of February Mr. Eleazer came into the office to pay me for this land. Q. When was the same made? A. First Monday of February. I think the 4th; at any rate, first Mon-

day.   Q. When he came in the office that morning to complete these transactions, how did he propose to make payment?   A. He had a check from one Mr. Riddle for $600.. Q. What did he want you to do?   A. Accept the check and give him my check for the difference.   Q. What was the difference?   A. $100.   Bid was $500.   Q. Did you do that?   A. No, sir.   Q. What was your reason?   A. I told Mr. Eleazer it was not my habit to give my official checks in making change for private individual checks.   I said there was no sense in my doing it, and 'you can attend to the matter yourself and save me the trouble and responsibility.'   Q. What did he do?   A. He said he would go to the bank.   Q. Did he come back?   A. Yes, sir; in about 30 minutes.   Q. What did he have?   A. A cashier's check on Lexington Bank.   Q. For how much?   A. $500, payable February 21st, signed 'W. P. Roof, Jr., Asst. Cashier.'   Q. The same check offered in evidence?   A. Yes, sir.   Same check offered in evidence.   Q. What did he propose for you to do? A. Wanted me to execute a deed for that check to his wife, Mrs. Sarah C. Eleazer.   Q. Did you do it?   A. I told him I could not execute the deed until I realized on the check; in the next place that the bid had not been properly transferred to him, and he had not transferred it to his wife at all.   Of course it could have been done, but Looney's transfer to Eleazer was not proper, and was out at that time.   Q. Was there anything said to him by you with reference to the validity of the check?   A. When I told him I would not execute the deed on the check until I had realized on check, he said, 'The check is as good as the bank.'   I said, 'Yes, sir; I expect it is, but it is possible the bank is not what it ought to be.'   Q. Did you say anything about getting the money?   A. Yes, sir.   He said the check was all right; and I said, 'If it is all right, just take it to the bank; I haven't even indorsed it.'   Q. Did he do it?   A. No, sir.   Q. What was your condition of health at that time—first, what did you do with the check?   A. I presented the check to Lexing-

ton Savings Bank for payment that afternoon, between 3 and 4 o'clock, before the bank closed.   I went in the bank door myself.   Q. Who did you present the check to?   A. Young W. P. Roof.   Q. What did he say?   A. When I went in I pushed the check in the window.   It had been my custom before to put the check in my bank book and pass over, but that time I just passed the check.   He said, 'Where is your book?'   I said, 'I do not want to deposit it; I want the money for it;' and I went on to explain to him why, and told him it was an estate in which a number of heirs were interested, and Mr. Graham held a mortgage on the premises, and I was expecting some trouble, and told him I was going to deposit the funds in another bank in a separate account.   Q. Where was Mr. Roof when this conversation was going on?   A. He was around in the side, back behind the railing.   Q. How far from you?   A. About the distance from me to you, say 10 feet.   Q. Did he have anything to say about it?   A. Why, when the conversation was going on between young W. P. and myself, he was over at the little red mahogany looking desk putting something in a book, and, about the time the conversation was over with myself and young W. P., Mr. Roof came over to where I was and was standing with his elbows propped up, looking over his glasses at me, and said, 'Why don't you deposit the check and check on us for what you need?' and I told him the circumstances.   Q. What did he say?   A. He said, 'It looks like some one is getting scared.'   I told him I was not scared, but told him things were not as satisfactory as they ought to be.   Those are my words almost verbatim.   Q. Did he pay the check?   A. He did not.   Q. What did he say in reference to it?   A. He said they were short of funds, and he intimated to me then that he was negotiating a loan; mentioned a loan between Roof and Barre Lumber Company.   Q. Negotiating a loan?   A. Yes, sir.   Q. Did he say anything about what to do with the check—about bringing it back?   A. I think he said he thought he would

be able to handle it in four or five days.   Q. Did you go back?   A. Yes, sir.   Q. What occurred when you went back?   A. Why, practically the same thing, except that I did not present it to young Roof; I went to Mr. Roof himself, went in a little office.   He was very much riled up that morning; wanted to know if I was going to keep on depositing.   Q. Well, what did he say about paying the check?   A. He said that Roof and Barre matter would be completed in a few days; he did not say that they would pay it; said that they hoped to be able to pay it then.   Q. Now, about what time intervened from the first presentation to the second presentation?   A. I think, Mr. Efird, about a week.   Q. About a week?   A. Yes, sir.   Q. Was there a presentation after that?   A. Another after that.   Q. What time was that?   A. On the evening of the 12th of March, I think.   I could not be positive as to the date.   The same date that Mr. Roof came to my office to get funds, if I had any.   It is the date that the $750 deposit was made.   Q. On that same date?   A. Yes, sir.   Q. What did he say with reference to to it?   A. Said they were so hard pressed, it was impossible to handle it then.   Q. Well, did you go back again?   A. I went back on the 4th, just before the bank closed—four or five days before.   Q. What did he tell you then?   A. I passed the check over to Mr. C. E. Leaphart, and he said, 'What do you want to do with it, deposit?'   I said, 'Not by a whole lot; I want the money.'   He said, 'You will have to see the Cap;' and I went in and had a conversation with Mr. Roof, in which he went over the situation pretty fully, and he told me then that, unless the Bank of Western Carolina would absorb his bank, there was no chance.   Q. That was the first time he ever told you straight out?   A. Yes, sir; that he saw no chance to reach bottom.

"Q. What was the condition of your health on the 21st?   A. I was in bad shape.   Q. What was the trouble?   A. Abscess in both ears.   Q. Was Court in session?   A. Yes, sir.   Q. Who was the Judge?   A. Judge Prince.   Q. On

the afternoon of the 21st, after this check was presented to the bank, what did you do or where did you go? A. To Columbia. Q. Who went with you? A. Mr. Haltiwanger and Mr. Luther Lorick. Q. Where is Mr. Lorick? A. In Columbia or Newberry, sometimes in one place and again in the other. Q. Now, did you have anything done for you in Columbia? A. Yes, sir. I have had my left ear operated on and my right ear chloroformed. Q. What condition in that night? A. As bad as a man could be. Q. And on the 22d? A. In bed all day; had a trained nurse. Q. On the 23d? A. I was in bed until late in the afternoon. Q. On the 23d your condition was such that you could not attend to business? A. My recollection is that I did come to the court-house upstairs that evening. Q. Well, now, on the 24th, what was your condition? A. I came to the office about 11 o'clock on the 24th. Q. Well, did you do anything on that day with reference to this matter? A. The very first thing I did on coming into the office was to write Mr. Eleazer a letter. Q. In what sort of an envelope did you inclose the letter? A. Official size, clerk of the Court's envelope, with return printed on the left. Official size about 3¼x10. Q. Has that letter ever come back to you? A. It has not. Q. To whom was the letter addressed? A. H. H. Eleazer, Chapin, S. C. Q. Why did you address the letter to Chapin? A. I thought Mr. Eleazer lived in the Spring Hill section, and, as such, I knew he was served by the route served by Mr. Walter Eleazer. The routes have changed; route originally went out from Peak. Q. You thought he was on that route? A. Yes, sir; I knew he lived down in the fork. Q. You never got your letters back? A. None whatever. Q. What was in the letter? A. I notified Mr. Eleazer that I had presented the check for payment, and up to that time had failed to collect, and asked him to what postoffice to mail the check. Q. Did you keep a copy? A. No, sir. Q. Were you keeping copies of letters at that time? A. None at all. Q. Did you afterwards write

another letter? A. I afterwards wrote another letter to Chapin, to the same place. Q. How long a space intervened between the first and second? A. I think it was a day or two after I had made the first presentation; I made the second presentation of the check before I figured on Mr. Eleazer having time to answer my letter. Q. When you made the second presentation, you had written the second letter? A. Yes, sir. Q. What sort of an envelope was that letter inclosed in? A. Same kind. Q. Did that letter come back? A. No, sir. Q. What was in that letter? A. Why, practically the same thing; that I had repeatedly tried to realize on the check, and up to this time I had failed, and, knowing the circumstances as I did, I suggested to him to come over at once and look after the matter himself. Q. You got no response? A. No response. Q. What did you do in reference to the matter? A. I waited long enough to hear from him, and I did not hear, and I called up Mrs. Hiller, central at Chapin. Q. Mrs. Nannie Hiller? A. Yes, sir; I asked Mrs. Hiller if I could reach Mr. Eleazer over the phone. She said I could not. I told her that I had repeatedly written Mr. Eleazer concerning some very important matter, and had been unable to get a reply. Mrs. Hiller asked me where did I write. I said Chapin, and she told me if I would write to Irmo I could reach Mr. Eleazer. She explained that the two routes came very close together from Chapin and Irmo. Q. She said that you could reach Mr. Eleazer at Irmo? A. Yes, sir. Q. Could you fix the time you got the information from her? A. About the 23d or 24th of March, about the time the bank closed. Q. Immediately upon information, what did you do? A. I wrote Mr. Eleazer again. Q. That letter is the one in evidence? A. Yes, sir. Q. After writing that letter on the 21st of March, how long after that time before Mr. Eleazer came here? A. My recollection is it was the 2d day of May. I never heard a scratch from him. Never answered any letter at all, and did not come until the day the creditors of the bank met.

"Q. Now, what disposition was made of the check at that time? A. He came in to see me, and I told him what I had done, and he said, 'Let me have the check.' I said, 'All right, it is your property, and has been your property;' and I gave him the check. He must have been gone out an hour or two. He came back to me with the same check, and he said, 'I have seen Mr. Roof, and I think he told me he had seen you and Mr. Timmerman,' In fact, I feel sure that he said that. He said, 'I want to leave the check with you.' I said, 'I cannot and would not assume the responsibility.' He said he did not mean that; that he had talked with Mr. Roof, and he said he would pay. Said Roof said he was worth enough to pay dollar for dollar. Q. What did he do with the check? A. Left it with me, and I put it in the safe. Q. And you presented it? A. Yes, sir. Q. Now, you made some deposits at this bank on March 2d, the books show, of $750? A. I did; yes, sir. Q. Now, Mr. Shealy, on what condition or under what circumstances was that deposit made? A. Mr. Roof came to my office in the latter part of the day, late in the evening, and took me in the vault and asked me to give him a couple thousand dollars on some other bank, and I told him I could not. He said, 'Haven't you got some checks you could give me?' I said: 'Yes, but I cannot give them to you. I am going to deposit the checks in some other bank.' I said: 'I have one for $750, brought by Mr. C. S. Rauch on your bank paid to me by Perry Harmon for share in partition case of —— v. ——. I have been unable to get over to the bank today, and if you agree to pay me Mrs. Fox's check I will agree to deposit it.' He said, 'Of course we will do it;' and I made the deposit. Q. You checked on it? A. Yes, sir. Q. With what result? A. I got one check of four hundred and something— Q. Out of the $750 you lost all except $468.54, after he promised to pay it? A. Yes, sir; after I told him I could not get other banks to take check. Q. They have a deposit of $506.87 March 12th? A. That is the deposit I referred to

as $450; I got the amounts mixed.   Q. You mean to say, after having made the $750 deposit and checked on it, they came and told you they could not pay unless you came back and made another deposit?   Then you gave the $506.87? A. Yes, sir.   Q. After that they did not pay it?   A. No, sir. Q. You lost that deposit and the other?   A. Yes, sir.   Q. You have had to pay these amounts?   A. Yes, sir.   Q. Did you have any conversation with Samuel P. Roof in reference to paying checks?   A. He said, 'There was no use to draw any more checks on us unless you give us some money.' Q. Can you fix about what date?   A. I think it was about 11th or 12th of March.   I asked him, 'What about the Roof & Barre loan?' and said, 'I thought the loan would put you people easy;' and he said it was practically all gone.   Q. Practically all gone?   A. Yes, sir; he said practically all gone.   Q. Did they tell you the amount of the Roof & Barre loan?   A. Yes, sir.   Q. How much?   A. $20,000.   Q. About the 11th or 12th they told you it was all gone?   A. Sam told me.   I called his attention to his turning down check after I had deposited money.   Q. Now, I have on my notes something about some Cullum checks; what was that? A. Some time in February, I think, about the 18th, before this cashier's check matter came up; that was not the first intimation, but the most substantial informtion, I had that the bank was beginning to get in bad condition.   Mr. Cullum sent me three checks and wrote me a personal letter in which he said, 'Please try to collect these checks.'   I think the letter and checks have been returned to Cullum.   Q. You received three checks from Cullum on Lexington Savings Bank to collect?   A. Yes, sir.   Q. What did you do with them?   A. I presented them.   Q. That was some time in February?   A. Yes, sir.   Q. Presented over the counter of bank?   A. Yes, sir.   Q. Were they paid?   A. They were not."

On the 21st February Mr. Shealy received the check.   It appears that he had doubts about the check, and Mr. Eleazer

had none. The check was payable that day, and was that day presented for payment and not paid. Mr. Shealy was sick on the 22d and 23d. On the 24th Mr. Shealy again presented the check, and again it was not paid. On that day (24th) Mr. Shealy wrote to Mr. Eleazer at Chapin, notifying him of the nonpayment. Mr. Eleazer's postoffice was Irmo. About the time the bank closed up Mr. Shealy made inquiry as to Mr. Eleazer's postoffice, and actually gave him notice of the nonpayment. The check has never been paid. The question is: Who shall lose the $500, Mr. Shealy or Mr. Eleazer? There is no use to consider the questions of conflict of testimony. It is true there are in these cases two questions, one of law and the other of fact, but the question of fact is a mere conclusion from facts that are not in controversy. Mr. Shealy presented the check for payment, and it was not paid on 21st February; there was no evidence that any attempt was made to give notice of nonpayment until the 24th February. Was that sufficient notice as a matter of law? Our cases hold that it is not. It is true Mr. Shealy was sick, but he was attending to business and presented the check. See *Scarborough* v. *Harris,* 1 Bay, 178, 1 Am. Dec. 609: "(1) Although it may not be necessary, in some cases, to give drawer notice of protest, as where drawer had no effects in drawee's hands (Doug. 55), yet this rule will in no case apply to an indorser (5 Burr. 2607). For, in all cases whatever, the holder of a bill must give reasonable notice to the indorser; that is, by first post or convenient opportunity, which is partly a matter of fact for jury what is reasonable or not. Doug. 499. (2) Wherever a new credit is given, the party holding takes it upon himself; and in no case where the holder gives time for payment to the maker is the indorser liable. 1 Term Rep. 167, 714; 1 Well. 48."

It is very manifest that Mr. Shealy withheld his hand on account of the promise of Mr. Roof to raise the money on a loan. There has been no change of the law. See, also,

*Diercks* v. *Robertson*, 13 S. C. 343, where it is said: "Whether due diligence was used in ascertaining the post-office of the defendant was a question of fact for the jury; but when the fact of residence was ascertained, or when due diligence had been employed in endeavoring to ascertain such fact, the question of diligence in giving the notice is a question of law, upon which it was the duty of the Court to have instructed the jury."

Did Mr. Shealy use due diligence? Mr. Shealy trusted to his memory, and his memory was in error. He had two effective methods of finding out the correct postoffice: The telephone, which did furnish the correct postoffice; and the county treasurer's books near at hand. Mr. Shealy had been county treasurer and knew that the books contained the postoffice. Memory is treacherous and is so regarded in law. We cannot hold that Mr. Shealy used due diligence.

Mr. Justice Hydrick concurs with Mr. Justice Fraser.

The Supreme Court being equally divided, the judgment of the Circuit Court was affirmed.

Mr. Justice Gage did not sit in this case.